UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:23-mj-00165 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| CAROLINE JOANNE HERRLING, | ) | Tuesday, January 24, 2023 |
| | ) | |
| Defendant. | ) | (1:09 p.m. to 1:56 p.m.) |


DETENTION HEARING

BEFORE THE HONORABLE PATRICIA DONAHUE,
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:          AUSA ANDREW BROWN
                        U.S. Attorney's Office
                        312 N. Spring Street
                        11th Floor
                        Los Angeles, CA 90012


For Defendant:          ALEX R. KESSEL, ESQ. (Via Zoom)
                        15910 Ventura Boulevard
                        Suite 1030
                        Encino, CA 91436


Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       Isabel Verduzco

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1       <u>**Los Angeles, California; Tuesday, January 24, 2023; 1:09 p.m.**</u>

2                                      --oOo--

3              **THE CLERK:**  Calling Case Number 23-MJ-165, *United*

4    *States versus Caroline Joanne Herrling*.  Counsel, please state

5    your appearances, starting with Plaintiff.

6              **MR. BROWN:**  Good afternoon, Your Honor.  Andrew Brown

7    for the Government.

8              **THE COURT:**  Good afternoon.

9              **MR. KESSEL:**  Your Honor, good afternoon to the Court.

10   Appearing by Zoom, with my client's permission, attorney Alex

11   Kessel.  And my client is currently in custody, Ms. Herrling,

12   whose I believe before the Court.

13             **THE COURT:**  All right.  Yes, she is present here in

14   court.  Good afternoon, Mr. Kessel.

15             And good afternoon, Ms. Herrling.  Ms. Herrling, I

16   just want to confirm you agree that your lawyer can appear at

17   the hearing this afternoon via Zoom rather than in person.

18             **THE DEFENDANT:**  Yes, he may.

19             **THE COURT:**  All right.  The Defendant, having

20   consented to her attorney appearing via Zoom for the hearing,

21   we will proceed.

22             The matter is here for a detention hearing.  It was

23   continued from the initial appearance last week.

24             Mr. Brown, what does the Government proffer in

25   support of its request for detention?

1        **MR. BROWN:**  The Government proffers:  the Complaint

2  Affidavit; the Pretrial Services Memorandum; the Government's

3  submission in support of request for detention, which is docket

4  number three, filed on January 17th; and then an email that I

5  sent to Pretrial Services on January 19th which consists of

6  nine pages with printouts and which I have previously emailed

7  to defense counsel and give a hard copy to Defendant Herrling.

8        **THE COURT:**  All right.  The Court has received and

9  reviewed all of those materials.

10        Mr. Kessel, let me just ask you.  Have you received

11  and reviewed all of those materials?

12        **MR. KESSEL:**  Yes, Your Honor.

13        **THE COURT:**  All right.  Then I'll hear argument,

14  beginning with the Government.

15        **MR. BROWN:**  Your Honor, Ms. Herrling is a very

16  unusual defendant.  I don't think that I have seen one before

17  who is so sophisticated in her obstruction of justice.

18        Basically the whole case is obstruction of justice.

19  She's using very sophisticated forgeries, power of attorney,

20  identity theft, and fake notary stamps to manipulate courts.

21        She has hired unwitting attorneys to help her take

22  over the assets of the elderly and the recently deceased,

23  including the few that are mentioned in the Affidavit:  the

24  Lowenstein property, the Wilding property, and the Robert

25  Tascon property, which total to about $5 million just worth of

4

1    real estate.

2         And one of the most troubling aspects of this case to

3    me is that even while she's being investigated, it doesn't

4    deter her, but she merely doubles down on her scheme.

5         And so she'll hire somebody to play the role of

6    Mr. Wilding, or she'll get a phone that's prepaid to imitate

7    Mr. Wilding, or she'll do other games like that in order to

8    always push back on the investigation.

9         I feel like a normal defendant who was faced with

10   such investigations would be deterred and would stop.

11        And yet while a homicide detective is telling

12   Ms. Herrling that he's going to start a missing person's report

13   and investigation on Charles Wilding, she actually goes out and

14   commits a whole new fraud with the stolen identity of Robert

15   Tascon.

16        And to me, Your Honor, that suggests a kind of

17   extreme recklessless (sic) -- recklessness and a brazenness

18   that shows that she cannot be controlled by any condition of

19   release.

20        I presume, but this is just speculation, that it's

21   because of her methamphetamine use that she behaves in such a

22   brazen way.

23        Your Honor, Defendant is also a flight risk.  As

24   shown in the proffered materials, she has communications with

25   her assistant about a Beliz corporation, travel to Beliz.

5

1          And very little of the money in this case has been

2     traced.  Of the real property's worth about $5 million, the

3     agents have only been able to trace $409,000 to the Defendant's

4     residence that she purchased in her true name.  And it makes me

5     worry that she has resources that could be used to fund her

6     flight.

7          I also see the Defendant as a danger to the

8     community.  I think it's very troubling that her last two

9     victims have disappeared under mysterious circumstances.

10          Charles Wilding appears to have died but his body has

11     never been found.  And the Defendant has gone to great efforts

12     to cover up his death and make it appear to the courts and to

13     law enforcement that he is still alive.

14          Similarly, Robert Tascon, her last-known victim of

15     property theft, died of a gunshot wound to the head.  And the

16     police ruled that to be a suicide.

17          And I'm certainly not saying Ms. Herrling shot him.

18     But there was no suicide note, there was no witness to the

19     suicide.  The last person to see Robert Tascon said that he was

20     in good spirits.

21          And, you know, he is to be sure a fragile man who had

22     mental health problems.  But he was also involved in litigation

23     with this Defendant over the fraudulent transfer of his

24     property.  And now he'll never be able to tell his story.

25          So perhaps she had nothing to do with his death

1   except inasmuch as a person who is not of strong mind maybe

2   pushed over the edge by being defrauded in the way that

3   Mr. Tascon was.

4           Your Honor, I don't know if you saw in the Complaint,

5   it almost looks like a scene from a movie.  When you turn the

6   bedroom closet door of the Defendant's house, there's just a

7   range of firearms, shotguns, assault weapons, pistols, slides.

8           She had a loaded handgun in her purse.  She had

9   another handgun that was hidden in a way that could only be

10  accessed with magnets.

11          She had ghost guns that were unregistered.  She had

12  counterfeit law enforcement badges for the Beverly Hills Police

13  Department, for the DEA, and for the U.S. Diplomatic Security

14  Service.

15          That certainly suggests somebody who is a danger to

16  society and also potentially adds to her risk of obstruction of

17  justice.

18          In the proffered materials submitted, there was blank

19  form for a nondisclosure agreement for top secret materials by

20  the U.S.

21          And obviously if the Defendant is running around with

22  firearms and a DEA or U.S. diplomatic security badge, she could

23  easily tell people that she was on official business, that what

24  she was doing was very hush-hush, and require them to sign a

25  nondisclosure agreement with the government in order to keep

1  her activities secret.

2          And that nondisclosure agreement, Your Honor,

3  actually states that you can be prosecuted criminally for

4  disclosing it.  So I think that goes both to danger and

5  obstruction of justice.

6          But, Your Honor, the Defendant doesn't just have to

7  be a physical danger to the community.  As you know, the Ninth

8  Circuit considers economic danger.

9          And here the Defendant has control of assets that she

10  has told investigators she is liquiding (sic) -- liquidating,

11  excuse me.

12          She has collectibles like artwork -- and I'm sorry, I

13  don't remember all the other valuables that were in her house

14  where she said she was in the process of selling them.

15          So if she were released, she would be free to

16  continue to liquidate the assets that she has improperly taken

17  through identity theft and through her obstruction of justice

18  where she manipulates the Court.

19          Your Honor, in addition, the agents found that she

20  had been doing searches on her computer for obituaries and

21  millionaires, and had lists of persons who either did or did

22  not have heirs.

23          So it's apparent that this is -- no, it wasn't just

24  Lowenstein, it wasn't just Wilding, it wasn't just Tascon.

25  That's what she does for a living.

8

1         And she's looking actively for new victims while

2  she's being investigated by the LAPD for the disappearance of

3  Charles Wilding.

4         So I see her as both a physical danger to society and

5  an economic danger in continuing her crime.

6         Your Honor, she was charged, in addition to her fraud

7  scheme and her identity theft, with possession of narcotics

8  with intent to distribute, which included methamphetamine and

9  heroin, among other drugs.

10         That creates a rebuttable presumption that no

11  condition or combination of conditions can assure the safety of

12  the community and the Defendant's appearance in the -- in

13  court.

14         And I think that the other facts here, such as the

15  counterfeit badges and the myriad firearms, go a long way to

16  showing the wisdom of that presumption.

17         Finally, Your Honor, the bond that is offered is, you

18  know, I don't want to say insulting, but it's just not

19  adequate.

20         If you take $5 million worth of property and then

21  your mother offers a $50,000 bond, that's literally one

22  percent.  And she's not even offering security.

23         Your Honor, I personally spoke to Jean and Tom

24  Herrling who are the Defendant's parents.  And they seem like

25  very solid, nice people.  I feel very badly for them.  I don't

1  want anything that I say to be taken as against them.

2          But initially in this case the talk was that they

3  would put up their entire home, which they said had about half

4  a million dollars in equity.

5          And after I spoke to them about the obligations of a

6  surety, they evidently changed their minds.  And I certainly

7  understand that, Your Honor, because I would, too, if I were in

8  their situation.

9          The Defendant has a drug problem, a gun problem, a

10  fraud problem.  And what she's asking is to be released back to

11  the house where she stored the fraud equipment, the firearms,

12  the fake badges, and all the evidence in this case.

13          And where her boyfriend admitted he had -- I can't

14  remember the number, whether it was 60, 70, or 80 but, you

15  know, a few ounces of methamphetamine.  And he had his own

16  guns, another two guns, in the house.

17          So I just -- I almost can't imagine a worse place for

18  the Defendant to go, where she's going to be back associating

19  with dangerous drug users who are involved in crime.

20          Like who wouldn't succumb in that situation?  It

21  would be the most natural thing in the world for her to resume

22  her old habits with her boyfriend that took place in that very

23  house.

24          So I think that if she gets released, she's being set

25  up to fail.  Now, whether it will be a drug test, whether it

1  will be more fraud, whether it will have to do with the

2  firearms, I can't say.

3          But I just don't see her succeeding when she's put

4  back into the dangerous environment that got her into this

5  place in the first instance.

6          And that is why I believe Jean Herrling decided not

7  to put up the half million dollars in equity she had in her

8  house, because she realized it was a very serious risk and she

9  could lose her house when her daughter reverted to her previous

10  criminal habits.

11          I almost feel, Your Honor, that her mother's decision

12  to only do $50,000 and only unsecured by itself answers the

13  question of whether Defendant is worthy of bond.  Thank you.

14          **THE COURT:**  All right.  Thank you, counsel.

15          Mr. Kessel.

16          **MR. KESSEL:**  Could I address any concerns of the

17  Court?  Because I had a few comments but I wanted to make -- I

18  wanted to focus my comments on any concerns of the Court; or

19  otherwise I can address a few matters.

20          **THE COURT:**  Well, as I said at the beginning of the

21  hearing, I have reviewed all of the materials that were

22  submitted.  And, quite frankly, Mr. Kessel, your client defines

23  flight risk and your client defines danger to the community.

24          So my concern is about everything the Government

25  mentioned and more.  So you can start by addressing the

1    dangerousness, both the physical dangerousness, as evidenced by

2    the firearms, and the economic danger.

3            MR. KESSEL:  First -- also, Your Honor, because I do

4    want to mention something, is the courtroom clear of any public

5    members?

6            MR. BROWN:  Your Honor, there are three new postal

7    inspectors who have as a job obligation to witness a detention

8    hearing.  And they are here in the front row of the

9    Government's side.

10           MR. KESSEL:  Okay.  I have no problem with law

11   enforcement agents because I wanted to mention some things,

12   Your Honor.

13           But as I understand the economic danger, Your Honor,

14   -- and I'm referencing there's three alleged frauds here

15   involving three alleged homes.

16           Mr. Wilding's home has not been sold.  That's the big

17   part of his estate is this home.  It's with the courts now, and

18   my client is in no position to sell it.

19           So it's not like -- the Government's made it seem

20   like $5 million has been taken by my client through these

21   victims.  And that's not true.  I want the Court to understand

22   the Wilding home is still -- has not been sold.

23           There's a second home that is still with the public

24   administrator that has not been sold, and no proceeds at all

25   have been connected to my client.

12

1          The Tascon, T-A-S-C-O-N, that's the only property

2     that has been sold.  And that has -- the police have traced

3     proceeds of that sale to the purchase of other property owned

4     by my client, okay, so -- which is about 400,000.

5          I'm not minimizing the fraud here.  But it seems the

6     Government is saying we got $5 million missing, so if you let

7     the Defendant out, she can go and use this money for further

8     criminality or to further her flight.  That's not true, Your

9     Honor.  That is just not true.

10          My client has no record.

11          Pretrial seems to suggest bond conditions.  And I

12     know you have to look at everything.

13          She has no record.

14          She has sold ties to Los Angeles County.

15          The house that she's arrested at, Your Honor, is a

16     sober living house.  And I want to mention that because it

17     seems the Government has made her the owner, possessor, and

18     controller over all the items that were found in that house,

19     which is not true.

20          The only gun that has a nexus to her was a legally

21     registered gun that was in her purse at the time the police

22     came into her house.

23          Now, the last time I remember, the Second Amendment

24     allowed, unless you were a prohibited person, the -- you're

25     allowed to have a gun in your house, loaded, that's registered

13

1   to you.

2          She has no history of violence in her past, zero.

3   None of the allegations in the Complaint even mention any

4   threat of violence by the Defendant toward anybody.

5          I hope the Government has made clear; if not, there

6   is not a single shred of evidence, Your Honor, connecting the

7   Defendant to Mr. Wilding's demise.

8          And, by the way, this is very important, I think the

9   reason I'm telling you this, Your Honor, because I think it's a

10  mitigating factor with respect to my client's incentive to

11  leave or incentive to do more harm economically to anyone.

12         And what I want to tell you is between the last

13  detention hearing, which I asked to continue -- and I

14  appreciate Your Honor setting it today.

15         But between the last hearing last week, I believe

16  Monday, and today, my client has proffered with the Government.

17  And the reason I'm telling you that is not to get the Court

18  involved in any plea negotiations.  But she has sat with the

19  Government.

20         And I truly believe the Government wants to work with

21  her fully where she has laid out all the major players in the

22  fraud.  And that's important to note that the other people

23  involved, the Government's very interested in.

24         She also came clean about her own level involvement.

25  And, what's most important, Your Honor, she indicated -- and I,

14

1    as her lawyer, would facilitate this, she wants to resolve this

2    matter.

3            So she has every incentive, Your Honor, to stay

4    around to see this case through obviously, and to obviously

5    better her chances of minimizing the danger of prison or less

6    prison by cooperating.

7            The Government mentioned the presumption from the

8    drug charges, and I think rightfully so.  And, again, I'm only

9    mentioning this so you know the full parameters of what the

10   Government's looking at.

11           The plea agreement that they have suggested does not

12   involve the drugs, does not involve the weapons.  And I only

13   say that, Your Honor, because that's the incentive when

14   somebody's looking at mandatory minimums to leave.  That's not

15   the situation here, Your Honor.

16           And I can understand why the Government wouldn't do

17   that, because there's a lot of other evidence to suggest that

18   other people had access to firearms, other people had firearms,

19   and there wasn't a whole lot of evidence to support that my

20   client distributed drugs.

21           She unfortunately was involved in fraud.  She is not

22   in any sense of the word a drug dealer.  And I'm not trying to

23   make her look better.  I'm trying to give the Court the

24   indication that this woman has every incentive to abide by

25   Court conditions because she wants to facilitate a settlement

15

1    of this case by cooperating.

2            And cooperation with the Government also means

3    abiding by any release conditions that would be in place.

4            The other thing I wanted to mention, Your Honor, and

5    I think this is important, and this may go to flight risk, I

6    can represent -- I've represented Ms. Herrling for the last

7    year and a half because when the homicide detective came to see

8    her, they -- he mentioned all the alleged victims involved in

9    this case, mainly Mr. Wilding because at that time he was

10   investigating his whereabouts, Your Honor.

11           But my point is we knew of the investigation for the

12   last year and a half.  There's been no efforts to flee to any

13   location.

14           Beliz, my client has no connection to.

15           She's never been -- there's not a hint of evidence

16   that she's ever used any badges.  And I don't even think the

17   people can prove those are hers, other law enforcement badges

18   or the like.

19           She is a paralegal, Your Honor, so she comes across

20   documents that are simply filed with the Court.  There's not a

21   shred of evidence that these badges, top secret documents, any

22   other illegality papers that the Court recently received from

23   the Government and that I received today, there's not a hint

24   that she's ever used those to facilitate a fraud, Your Honor.

25           And I think that's very important because if there

16

1   was such evidence, my argument would be diluted that she would

2   use those to facilitate either flight or more crime.

3           I think the best thing she's got going, Your Honor,

4   right now is that incentive to plead, to proffer.

5           And during that proffer, she laid out everybody else.

6   She told them where possibly they might be able to locate the

7   missing person.  She did everything she could.

8           And I think if the Government was truthful, they want

9   further proffers with her.

10          This I'm only mentioning, Your Honor, as an incentive

11  for my client to abide by the conditions.  That's why -- that's

12  one of the main things that courts want to instill in a

13  defendant when they impose conditions is that the defendant has

14  the incentive not to violate the law, the defendant has the

15  incentive not to take efforts to flee, and the defendant has

16  the incentive to abide by every condition that the Court

17  imposes.

18          A plea agreement, a proffer agreement, a cooperation

19  agreement, those are all reasons for a defendant to have the

20  incentive to abide by the things I mentioned.

21          I can understand reading that Complaint, Your Honor.

22  It looks and it is serious.  My main argument to the Court now

23  is the change of circumstance between her arrest and now

24  facilitates a release at least with very strict conditions,

25  which could include her mom signing.

1          And I don't want to -- I think the prosecutor

2    speculated a little bit about mom not wanting to sign because

3    she doesn't trust her daughter.  I disagree with that.

4          They're 80 years old.  Their property's in Florida.

5    And I think they're concerned about that aspect, not their

6    daughter, Your Honor.  They obviously feel bad about their

7    daughter.  They want to help their daughter in every way they

8    can.

9          But I think there's other conditions that the Court

10   can impose.  She can move out of that sober living, although

11   it's a going business now, but she has another place she could

12   live.

13         She can be under strict pretrial services

14   supervision, home detention, electronic monitoring, orders not

15   to get onto the computer, orders not to engage in any legally

16   related activity to real estate or whatever other areas the

17   prosecution deems appropriate.

18         But there are conditions that can facilitate her

19   continued effort to cooperate, Your Honor, and would ask you to

20   consider that.  Thank you.

21         **THE COURT:**  All right, thank you.  Mr. Kessel, just

22   so I clearly understand though, her mother, the proposed

23   surety, is not willing to post a bond secured by the residence

24   I think you said in Florida; is that correct?

25         **MR. KESSEL:**  Your Honor, when I spoke to her

18

1    initially a week ago, she didn't think so.  When I spoke to her

2    yesterday about bond conditions, she was on the fence.  And I

3    told her I would tell that to the Court.

4           And she would be willing to reevaluate it because

5    it's important.  And that's where she at least for now

6    indicated that she would sign an unsecured bond.

7           But she did not yesterday say no, never.  She wanted

8    to -- her and her husband obviously wanted to see the outcome

9    of today's hearing before she reconsidered it, Your Honor.

10   That's the state of what I believe her mental state is at this

11   point in time.

12          **THE COURT:**  All right.  And then, Mr. Kessel, you

13   mentioned that she had a gun in her purse which you stated it

14   was lawful for her to possess.  But I'm looking at paragraph 92

15   of the Affidavit.

16          And in addition to that gun, it states in the closet

17   of her bedroom on display were several assault weapons,

18   including AR-15-type guns, AR-15 receivers, a shotgun, and

19   magazines.

20          And then paragraph 93 states also secreted in

21   Herrling's bedroom near her bed was a gun stash that required

22   the use of magnets to uncover.  Also beside her bed was a ghost

23   gun.

24          **MR. KESSEL:**  Your Honor, obviously I saw that in

25   there.  I can tell you this.  I don't believe other than the

19

1    gun that was in her bag that's registered to her -- there are a

2    lot of people in and out of that house.

3            And I say it because it's a sober living house.

4    There was another person occupying that bedroom with her and

5    was there at the time.

6            I don't think unlike a lot of cases where she has

7    exclusive possession and control over an area where you can

8    surmise that it -- only her and her alone possessed those

9    firearms.

10            So those are very much in controversy about her nexus

11    and either exclusive or constructive possession over those.

12    That's the only thing I can say.

13            And the other part is her prior record, Your Honor,

14    or all the investigation done by the detectives in this case,

15    none of the allegations involve her displaying a gun, having a

16    gun with her, threatening anybody with a gun.

17            And that's important, Your Honor, because this

18    investigation's gone on for two and a half years.

19            And you can see in the Complaint there's allegations

20    of her doing fraud, but there's not a single allegation of her

21    having or using or threatening to use any firearm.  And that

22    just buttresses the argument that those guns do not belong to

23    her, Your Honor.

24            **THE COURT:**  All right.  Thank you, Mr. Kessel.

25            Does the Government have anything further, and in

20

1    particular, based on Mr. Kessel's argument that his client is

2    attempting to cooperate with the Government and that that

3    should impact a determination regarding detention?

4          **MR. BROWN:**  Yes, Your Honor.  So there are a few

5    points that I wanted to address that Mr. Kessel made.  First,

6    it is certainly true that she did meet with the Government.

7          She was -- appeared to be generally truthful about

8    some issues and not in particular about the Robert Tascon

9    fraud, which she repeatedly denied, notwithstanding that

10   counterfeit identity documents bearing the name of Robert

11   Tascon were sent to her by her boyfriend, and that she got

12   $950,000 from the fraud into a account that she had signature

13   control over.

14         And it is true that I do want to continue to work

15   with her.

16         And, Your Honor, if I believed that she would be safe

17   on the street, I would advocate for that because she would be

18   much more useful to the Government if she could go and

19   interview people and do meetings and whatnot.

20         But the same way that Jean Herrling doesn't want her

21   daughter to fail on release and lose her house, I don't want

22   Ms. Herrling to fail on pretrial release and get involved in

23   additional crimes.

24         So what he said about the proffer is true.  But I see

25   that as a -- just a completely separate issue than detention.

1       Mr. Kessel said that only one of the properties sold.
2   That's not true.  In paragraph 29 of the Affidavit it talks
3   about the Jackie Shields Lowenstein property.
4       The property sold at probate auction on November 3rd,
5   2021 for $1.94 million.  I don't think that's an important
6   point, Your Honor, but I just wanted to correct the record.
7       Similarly, Mr. Kessel says that we can't link the
8   badges to her.  That's not true.  She acknowledged the badges
9   were hers.  She said that she didn't use them for any nefarious
10  purposes but she admitted that they were hers.
11      Similarly, Mr. Kessel tries to raise doubt about who
12  possessed the firearms.  Well, she was a little coy.  When the
13  agents spoke to her, she said that she had some guns.  So, yes,
14  there is one gun that is registered to her.  But some implies
15  more than one.
16      And while it is true that there were other people in
17  the so-called sober living facility, they weren't in her
18  bedroom, which is where all the guns were.
19      Now, her boyfriend, Sam, said that two of the guns
20  found in the garage were his.  He also said that the lion's
21  share of the meth, which was in the garage, I can't remember
22  again, and it's like 60 or 70 grams, was his.
23      So, to me, he has some indicia of honesty because
24  he's taking the lion's share of the meth on himself.  But he
25  only copped to two of the guns, two of the 16 guns found in the

1   house.

2          I think it's a stretch to say that members of a sober

3   living facility are wandering into the Defendant's own bedroom

4   and building magnet stashes and stuffing guns in them and

5   strapping guns to the back of her bedroom door.  I mean, like

6   that's -- that just doesn't make any sense.

7          Similarly, Mr. Kessel discusses that she did not flee

8   during the investigation which she was aware of.  That's true.

9          Instead, she did everything she could to obstruct

10  justice, which included hiring somebody to lie to the police

11  and say, oh, yes, Charles Wilding has been living with me and

12  he's very well off and he went off to parts unknown.

13         And that same person she hired to intimidate a person

14  who threatened to expose her scheme unless he had received a

15  payout.  Now, that person never did expose her scheme so we

16  don't know what happened.

17         Was the, you know, blackmailer simply puffing and

18  never did anything?  Did the Defendant find somebody who was

19  more sinister than the one that she hired to pretend to live

20  with Charles Wilding and that's why the other person did not

21  expose her scheme?  You know, we can't say.

22         This is a probable cause arrest.  There's a lot of

23  investigation for us left to do.

24         But it is entirely different for her not to flee when

25  she thinks in her methamphetamine-addled mind that she is a

1    master of the universe and that she can just throw $5,000 here,

2    $5,000 there and get everybody in the world to lie and adopt

3    her story or intimidate her enemies or otherwise vanquish the

4    law enforcement investigation; very different than when the

5    Federal government comes, executes a search warrant on her

6    house, gathers up all the evidence of the fraud, and takes her

7    away in handcuffs.  She's in a very different situation now.

8            Thank you, Your Honor.

9            **THE COURT:**  All right.  Thank you, counsel.

10            Mr. Kessel, did you have anything that you would like

11    to add?

12            **MR. KESSEL:**  No, Your Honor.  Thank you for the

13    opportunity.

14            **THE COURT:**  All right, thank you.

15            As I said, I have received and considered all of the

16    materials proffered by the Government.  I have also considered

17    the arguments from counsel.  And the Government's request for

18    detention is granted.

19            There is no condition or combination of conditions

20    that will reasonably assure the safety of the community and

21    other persons, and no condition or combination of conditions

22    that will reasonably assure the appearance of the Defendant as

23    required.

24            So the Defendant is ordered detained both on grounds

25    of risk of flight and on grounds of dangerousness.

24

1        As to dangerousness, both the physical dangerousness

2   as evidenced by the firearms and most definitely as to economic

3   dangerousness given the breadth, sophistication, and brazenness

4   of the scheme described in the Affidavit in support of the

5   Complaint.

6        The Defendant also clearly has the means, motive, and

7   ability to flee the jurisdiction and not appear in court as

8   required.

9        So for all of the reasons -- all of those reasons, as

10  well as all of the reasons set forth by the Government in its

11  argument, the Defendant is committed to the custody of the

12  Attorney General pending trial in this matter.

13        All right.  Is there anything further from the

14  Government?

15        **MR. BROWN:**  Yes, Your Honor.

16        The Defendant previously waived preliminary hearing

17  at her first appearance, so the Government has until February

18  13th to file the Indictment or Information in this case.

19        We have not set a PIA date.  So any -- and Judge

20  Rosenbluth left it to you to set the PIA date.  So any date

21  from February 14th on is fine with the Government.  And I don't

22  know what Mr. Kessel's schedule is but I hope we can pick a

23  date that works for him.

24        **THE COURT:**  All right.  And let me ask my

25  courtroom --

25

1          **MR. KESSEL:**  Your Honor, --

2          **THE COURT:**  -- deputy to propose -- just one moment,

3  Mr. Kessel.

4          I'm going to have my courtroom deputy propose some

5  available dates for post-indictment arraignment.

6      **(Pause)**

7          **THE CLERK:**  January 31st or --

8          **THE COURT:**  I think after February 4 --

9          **THE CLERK:**  Oh.

10          **THE COURT:**  After February 13th because there is a

11  waiver of a preliminary hearing in this case.

12          **MR. BROWN:**  Exactly.

13          **THE CLERK:**  So February 16th and 17th are available.

14          **THE COURT:**  All right.  So, Mr. Kessel, February 16

15  and February 17 are available.  That's post-indictment

16  arraignment.  I think that would be at 11:30.

17          **THE CLERK:**  Yes.

18          **THE COURT:**  At 11:30.

19          **MR. KESSEL:**  Your Honor, I'm out of the jurisdiction

20  on the 16th and 17th.  I can file an association with my

21  associate to be present.  But if there's two other dates other

22  than the -- I'm going the 16th through -- that's president's

23  weekend, which the Monday is a holiday.  I don't know if

24  there's sometime after that.

25          **THE CLERK:**  The 21st, February 21st.

26

1          **MR. KESSEL:**  That will work.

2          **THE COURT:**  That does work, Mr. Kessel?

3          **MR. KESSEL:**  Yes.  That's the day after the holiday.

4  Yes, that will work.

5          And my client, Your Honor, just for -- she's already

6  executed a waiver of indictment as well.  And I'm going to send

7  that on to Mr. Brown today or tomorrow.

8          **THE COURT:**  All right.

9          **MR. KESSEL:**  So he's not under any pressure to indict

10  my client.

11          **THE COURT:**  All right.  Thank you, Mr. Kessel.

12          Mr. Brown, does February 21st work for the Government

13  for PIA?

14          **MR. BROWN:**  Yes, thank you, Your Honor.

15          **THE COURT:**  All right.  So post-indictment

16  arraignment will be February 21st, 2023 at 11:30 a.m. in the

17  duty courtroom.  That's courtroom 880 in the Roybal Federal

18  Building.

19          **THE DEFENDANT:**  Your Honor, may I say something?  I'm

20  sorry, I'm not sure if it's okay but --

21          **THE COURT:**  I -- Mr. Kessel, your client is asking to

22  address the Court.

23          **MR. KESSEL:**  Well, I'll let her start and I'll may

24  stop her depending on what she's saying, Your Honor.

25          **THE DEFENDANT:**  I just wanted to --

27

 1          **MR. KESSEL:**  I have no objection.

 2          **THE DEFENDANT:**  Okay.  I just wanted to let the Court

 3  know that I spoke with my mother this morning and she was

 4  willing to put the house and an unsecured bond up.  And --

 5          **THE COURT:**  All right.

 6          **THE DEFENDANT:**  -- I know that was information that

 7  was not given to the Court yet.  But when I spoke with her this

 8  morning, she would sign the house if that made any difference.

 9          **THE COURT:**  All right.  Thank you for that

10  information.

11          **MR. KESSEL:**  If I can ask, Your Honor, and I will

12  follow-up, is that something -- obviously if I set a

13  reconsideration, it would come back to Your Honor.

14          I just want to know, and I appreciate the honesty, is

15  that something the Court would reconsider if the mom was

16  willing to deed her property as a bond surety?

17          **THE COURT:**  Well, Mr. Kessel, I'm not really in a

18  position to give an advisory opinion.  You know, decision to

19  reconsider is based on all of the evidence that is, you know,

20  presented to the Court.

21          If all of the facts were identical and that were the

22  only difference, I would still rule that the danger to the

23  community, particularly the economic danger to the community,

24  is too great.

25          But obviously I would have to look at all of the

1    specific information and any other information that you or the

2    Government had to offer.

3             **MR. KESSEL:**  Thank you for that insight, Your Honor.

4    I appreciate that.

5             **THE DEFENDANT:**  Thank you.

6             **MR. KESSEL:**  Thank you.

7             **THE COURT:**  All right.  Is there anything further

8    then from the Government?

9             **MR. BROWN:**  No, Your Honor.  Thank you.

10            **THE COURT:**  All right.  From the defense?

11            **MR. KESSEL:**  No, Your Honor.

12            I'm just going to tell my client that I will see her

13   soon at MDC.  Thank you, Carrie.

14            **THE DEFENDANT:**  Thank you, Alex.

15            **THE CLERK:**  Court is adjourned.

16            **MR. KESSEL:**  Thank you, Your Honor.

17            **THE COURT:**  Thank you, Mr. Kessel.

18        **(This proceeding was adjourned at 1:56 p.m.)**

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>June 7, 2024</u>

        Signed                                             Dated


*TONI HUDSON, TRANSCRIBER*